Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:   (619) 826-8065

James S. Terrell, Esq. SBN 170409
jim@talktoterrell.com
115411 Anacapa Road
Victorville, CA 92392
Telephone:  (760) 561-2699
Facsimile:   (760) 952-1085

Sharon J. Brunner, Esq. SBN 229931
Sharon.j.brunner@gmail.com
Law Office of Sharon J. Brunner
14393 Park Avenue, Suite 101
Victorville, CA 92392
Telephone:  (760) 243-9997
Facsimile:   (760) 843-8155

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES ENYART, Individually, GREGORY ENYART, Individually, and AMANDA KELLEY as GUARDIAN AD LITEM TO A.E., Individually and as Successor in Interest to WILLIAM ENYART, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN BERNARDINO, ANGEL AVARADO, Individually, ANDRES ZAVALA, Individually, NATASHA CHARLES, Individually, SEBASTIAN HERRERA, Individually, ANDRES SUAREZ, Individually, CHRIS HENSMAN, Individually, FORREST PITTS, Individually, ALEXANDER GARCIA, Individually, and DOES 1-10, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> **1. 14th AMENDMENT – INADEQUATE MEDICAL CARE** <br><br> **2. 14th AMENDMENT – INADEQUATE POLICY & TRAINING** <br><br> **3. 14th AMENDMENT – LOSS OF ASSOCIATION** <br><br> **4. CCP § 52.1 – BANE ACT** <br><br> **5. CCP § 377.30 – NEGLIGENCE** <br><br> **6. CCP § 377.60 –WRONGFUL DEATH** <br><br> **7. 42 U.S.C. § 1983 – RATIFICATION** |

COMPLAINT                                    CASE NO.

# I.

## **INTRODUCTION**

1.      William "Billy" Enyart was a typical 36-year-old man.  He loved sports, dirt bikes, his turtle Walter, and his daughter, A.E.  Billy lived with his parents, Greg and Fran Enyart.  Since Greg was diagnosed with cancer years ago, Billy dedicated his life to being Greg's full-time caregiver because he was too afraid to leave his dad's side.

  

2.      On July 27, 2022, Billy's parents, and his two siblings, Amanda and Nick, confronted him with their concerns about his self-medicating to treat his severe anxiety and depression.  Billy was diagnosed with severe depression and anxiety ten years prior.  Until the last four years, Billy was prescribed Xanax to control his symptoms.  However, when doctors began cracking down on opioid prescriptions, Billy started drinking daily to self-medicate.

3.      During the intervention, Billy started yelling at his family although he never became violent or aggressive.  As Greg had done before in the past, he called the non-emergency police line and requested an officer talk with Billy about getting help.  These efforts were successful in the past.

4.      Unfortunately, on this occasion, Billy was not offered mental health treatment.  Rather, he was arrested and booked into High Desert Detention Facility.

/ / /

2

COMPLAINT                          CASE NO.

5.      During intake, despite being visually drunk, slurring his words, and smelling of alcohol, intake nurse, Defendant Angel Alvarado, failed to document Mr. Enyart's use of alcohol, and failed to house him in a sobering cell, as required by County policy and Title 15, which would have resulted in routine medical monitoring and treatment in the form of taking vitals and administering medication.

6.      Based on the jail medical records, it is clear that intake nurse, Defendant Angel Alvarado, failed to house Billy in a sobering cell and failed to document, screen, or treat him for impending alcohol withdrawals despite clear signs that Billy was intoxicated during the intake screening.

7.      Nevertheless, terrified that Billy was going to die in jail due to untreated alcohol withdrawals, over the next five days Fran and Greg called the jail **thirty-two times**.  Each time, pleading to ensure Billy was ok and receiving appropriate withdrawal and mental health treatment.

8.      Unfortunately, the medical information relayed to the various deputies and correctional staff was not communicated to medical personnel, nor were the family's warnings logged into Billy's medical chart or jail profile.

9.      Approximately three-to-four days later, Billy began suffering from the most severe symptoms of alcohol withdrawals, Delirium Tremens.  Delirium Tremens is defined by hallucinations, disorientation, tachycardia, hypertension, hyperthermia, agitation, and sweating in the setting of acute reduction or abstinence from alcohol.

10.      Based on the medical notes from High Desert Detention Facility ("HDDF"), on July 29, 2022, mental health personnel from HDDF assessed Billy and determined he was delusional, disorganized, paranoid, and responding to internal stimuli.  The mental health staff at HDDF determined they could not safely house and medically monitor Billy at HDDF.

11.      On July 30, 2022, Billy was transferred to West Valley Detention Center ("West Valley") for the explicit purpose of housing him as a Severely

COMPLAINT                              CASE NO.

1  Mentally Ill Lockdown ("SMIL") inmate because HDDF did not have the medical
2  capacity to house SMIL inmates.  According to the County's policy, SMIL inmates
3  shall be housed in single occupancy cells in "Sheltered Housing."  "Sheltered
4  Housing is located in Unit 15 at West Valley.  Inmates housed in Unit 15 are
5  sheltered due to mental health issues.  Care is provided in Unit 15 on a 24-hour
6  basis, with the support of a medical nurse and mental health personnel."  In other
7  words, the setup of Unit 15 allows for constant and continual medical monitoring.

8      12.    However, despite being transferred to West Valley for continual
9  medical and mental health treatment and monitoring in the SMIL Sheltered
10  Housing unit, Defendant Zavala, the classification deputy, that knew Billy required
11  Unit 15 housing, intentionally housed Billy in the Covid reception unit,
12  affirmatively denying Billy around the clock medical and mental health monitoring
13  and treatment.  Notably, Defendant Zavala was the only jail personnel that could
14  determine what housing unit and segment Billy could be housed in at West Valley.

15      13.    In fact, the Covid reception unit, Unit 4, had no medical monitoring
16  requirements in place.  Meaning, Billy was not monitored by medical staff since
17  being transferred to West Valley, and received the same hourly correctional checks
18  that all general population inmates receive.

19      14.    Ove the next two days, Billy's symptoms got even worse after he was
20  transferred to West Valley.  Billy was suffering from auditory and visual
21  hallucinations, the most common symptom of delirium tremens.  Billy also had
22  bruises and red welts all over his body, another sign of delirium tremens.  (Notably,
23  all correctional deputies receive on-board training regarding the signs and
24  symptoms of delirium tremens, and its fatality rate if untreated.)
25  / / /
26  / / /
27  / / /
28  / / /

COMPLAINT                              CASE NO.

15.     In video surveillance footage, Billy can be seen shaking and banging up against the walls.  On several occasions he can be heard asking the deputies, "come help me."  Billy can be heard banging on the cell door, breathing heavily, and asking for help over an extended period of time.  He stated that he was not feeling good and was continually yelling in distress for two and a half days.

16.     Instead of responding to Billy or summoning medical aid, the deputies responsible for Billy's housing segment on July 31, 2022, Defendants Natasha Charles, Sebastian Herrerra, and Andreas Suarez, intentionally ignored Billy's severe medical distress.  Outrageously, instead of responding to Billy or summoning medical care, Defendants Natasha Charles, Sebastian Herrerra, and Andreas Suarez yelled at Billy to stop banging on the door and to be quiet.  Medical records and discovery responses confirm that Defendants Natasha Charles, Sebastian Herrerra, and Andreas Suarez did not encounter Billy and did not ask for medical intervention.

17.     According to *several* inmate interviews of other inmates housed in Covid reception Unit 4, Billy was continuously screaming and calling out for help on July 31, 2022, and into the morning of August 1, 2022.  Inmates recall hearing Billy yell "help, help" for hours on end.

18.     On the morning of August 1, 2022, the audio interviews and video surveillance confirm that Billy was in continual distress.  At times he is naked in his cell and responding to internal stimuli, i.e., auditory and visual hallucinations.  On several occasions, Billy is seen rocking back and forth, banging on the cell door, and screaming for help.  Video surveillance shows that not one deputy responded to Billy's calls for help.  Similarly, medical records confirm that medical was not summoned by the Unit 4B deputies for intervention.

/ / /

/ / /

/ / /

COMPLAINT                              CASE NO.

19.     After five days of untreated alcohol withdrawals, on August 1, 2022, at 1:15 p.m., Billy was found dead in his cell.  According to Plaintiffs' addiction expert, Billy died from Delirium Tremens, which is the most serious symptom of alcohol withdraw and leads to death if not properly treated.

20.     Billy's foreseeable and predictable death leaves A.E. fatherless.  He also leaves behind his mother Fran, his father Greg, and his siblings, Amanda and Nicholas.  The Enyart family has been destroyed by Billy's loss.

**II.**

**JURISDICTION AND VENUE**

21.     This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983.  The jurisdiction of this court is invoked pursuant to 28 U.S.C section 1331 and 1343.  State law claims are alleged as well, over which Plaintiffs invoke the Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a).

22.     This case is instituted in the United States District Court for the Central District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.  The incident giving rise to this lawsuit occurred in San Bernardino County custody.

23.     Pursuant to the California Government Code, Plaintiffs filed their tort claim with the County of San Diego based on the foregoing incident on August 5, 2022.  The claim was rejected on September 28, 2022.  Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

**III.**

**PARTIES**

24.     Billy Enyart was a resident of San Bernardino County in the State of California and a citizen of the United States at all times relevant to this complaint. He died in-custody at West Valley, which is located in San Bernardino County.

6

COMPLAINT                                    CASE NO.

25.     Francis Enyart "Fran" is an individual residing in the County of San Bernardino, California, and was at all relevant times the natural mother of Billy. Fran sues in her individual capacity as the mother of Billy.  Fran seeks both survival and wrongful death damages under federal and state law.

26.     Gregory Enyart "Greg" is an individual residing in the County of San Bernardino, California, and was at all relevant times the natural father of Billy. Greg seeks both survival and wrongful death damages under federal and state law.

27.     A.E. is Billy's minor daughter.  A.E. is a resident of San Bernardino County in the State of California and a citizen of the United States at all times relevant to this complaint.  A.E. brings this action in her individual capacity as the natural child of Billy and in a representative capacity as a successor-in-interest to Billy by and through Amanda Kelley pursuant to California Code of Civil Procedure Sections 377.30 and 377.60.  A.E. seeks both survival and wrongful death damages under federal and state law. By and through this complaint, and pursuant to Federal Rule of Civil Procedure 17(c)(2), Billy's sister, Amanda Enyart Kelley, moves this Court to appoint her as A.E.'s *guardian ad litem* and as Succwor In Interest to the Estate of Wiliam Enyart, for the sole purpose of pursuing this action.  An Application for a Guardian Ad Litem is submitted herewith.

28.     Defendant Angel Avarado was working at High Desert Detention Facility as an intake nurse on July 27, 2022.  Defendant Avarado knew, or should have known, that Billy was severely intoxicated and required medical monitoring, treatment, and housing in a sober cell.  Based on information and belief, Defendant Avarado lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

29.     Defendant Deputy Andres Zavala was working at West Valley as a classification deputy.  He was responsible for housing Billy in a Severely Mentally

COMPLAINT                          CASE NO.

Ill (SMIL) unit for around the clock medical care and monitoring.  Instead of placing him in an SMIL unit, Defendant Deputy Andres Zavala housed Billy in an isolated quarantine cell with no additional monitoring.  Based on information and belief, Defendant Andres Zavala lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

30.     Defendant CSC Natasha Charles was working at West Valley as a bubble deputy.  She was responsible for monitoring Billy's housing unit and responding/summoning medical care to inmates that display a need or request medical intervention.  Defendant CSC Natasha Charles knew that Billy was in extreme medical distress and ignored Billy's serious medical needs.  Based on information and belief, Defendant CSC Natasha Charles lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in her capacity as an employee/agent of the jail and was acting under the color of state law.

31.     Defendant Sebastian Herrera was working at West Valley as a housing deputy.  He was responsible for monitoring Billy's housing unit and responding/summoning medical care to inmates that display a need or request medical intervention.  Defendant Sebastian Herrera knew that Billy was in extreme medical distress and ignored Billy's serious medical needs. Based on information and belief, Defendant Sebastian Herrera lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county. At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

32.     Defendant Andres Suarez was working at West Valley as a housing deputy.  He was responsible for monitoring Billy's housing unit and responding/

8

COMPLAINT                          CASE NO.

summoning medical care to inmates that display a need or request medical intervention.  Defendant Andres Suarez knew that Billy was in extreme medical distress and ignored Billy's serious medical needs.  Based on information and belief, Defendant Andres Suarez lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

33.     Defendant Chris Hensman was working at West Valley as a housing deputy.  He was responsible for monitoring Billy's housing unit and responding/ summoning medical care to inmates that display a need or request medical intervention.  Defendant Hensman knew that Billy was in extreme medical distress and ignored Billy's serious medical needs.  Based on information and belief, Defendant Hensman lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

34.     Defendant Forrest Pitts was working at West Valley as a housing deputy.  He was responsible for monitoring Billy's housing unit and responding/ summoning medical care to inmates that display a need or request medical intervention.  Defendant Forrest Pitts knew that Billy was in extreme medical distress and ignored Billy's serious medical needs. Based on information and belief, Defendant Forrest Pitts lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.  At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

35.     Defendant Alexander Garcia was working at West Valley as a housing deputy.  He was responsible for monitoring Billy's housing unit and responding/ summoning medical care to inmates that display a need or request medical

COMPLAINT                              CASE NO.

intervention.  Defendant Alexander Garcia knew that Billy was in extreme medical distress and ignored Billy's serious medical needs. Based on information and belief, Defendant Alexander Garcia lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county. At all times herein, Defendant was working in his capacity as an employee/agent of the jail and was acting under the color of state law.

36.    Defendant County of San Bernardino ("County") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Bernardino County citizens.  At all times mentioned herein, Defendant County was responsible for policing the public and for overseeing the operation, management, and supervision of the County jails such as West Valley and HDDF, as well as its Corrections Officers, Medical Staff, and inmates.  The County is also responsible for developing, implementing, and amending jail policies, procedures, and training.

37.    The names of the other individual Sheriff's Deputies and Medical Staff who are responsible for Plaintiffs' injuries are currently unknown to Plaintiffs.  As such, these individuals are sued herein as DOES 1-10.

38.    The true names and capacities whether individual, corporate, associate or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiffs, who therefore sue said defendants by said fictitious names.  Plaintiffs will amend this complaint to show said defendants' true names and capacities when the same have been ascertained.  Plaintiffs are informed and believe and thereon allege that all defendants sued herein as DOES are in some manner responsible for the acts and injuries alleged herein and committed these injuries while acting under the color of state law and within the scope of their employment.

39.    At all times mentioned herein Defendants named herein as DOES 1-10 were employees and/or independent contractors of San Bernardino County and in doing the acts hereinafter described acted within the course and scope of their

1  employment.  The acts of all defendants and each of them were also done under the
2  color and pretense of the statutes, ordinances, and regulations of the San Bernardino
3  County and the State of California.  In committing the acts and/or omissions alleged
4  herein, all defendants acted under color of authority and/or under color of law.
5  Plaintiffs sue all public employees named as Defendants in their individual
6  capacities.

7  **IV.**

8  **FACTS RELEVANT TO ALL COUNTS**

9      40.    On July 27, 2022, around 2:45 p.m., Billy's family called the
10  nonemergency police line asking for someone to come talk to Billy because Billy
11  became upset after the family encountered him about his alcoholism.  Billy's family
12  had done this in the past and it resulted in helpful conversation between law
13  enforcement and Billy regarding his life and his future.  This time, Billy was
14  arrested and transported to HDDF.

15      41.    When Billy was booked into HDDF, he was initially screened by
16  intake nurse, Defendant Angel Avarado.  During the screening process, Billy was
17  slurring his words and smelled of alcohol.  Billy was uncooperative during the
18  booking process and "reeked of alcohol."  Any reasonable person, let alone an
19  intake medical provider, should have known Billy was intoxicated and required
20  documentation, monitoring, and special housing in a sober cell.

21      42.    Under section 8.100 (Intake Procedure) the section on health screening
22  clearly identifies being under the influence of drugs and/or alcohol as one of the
23  potential reasons that "may require pre-booking hospital exam."  This assessment
24  was not performed by Defendant Avarado.

25      43.    Under section 120.04 (Health Screening), Defendant Angel Avarado
26  should have housed Billy in a sobering cell.  Had that occurred, the cell would have
27  been monitored every thirty minutes and Billy's behaviors and vitals would have
28  been noted in the Specialty Cell Log.

11

COMPLAINT            CASE NO.

44.     Under section 521.08 (Intoxication Assessment), if an arrestee is determined to be under the influence of alcohol, an initial medical evaluation shall be completed by a designated Health Services staff member upon placement in a sobering cell and at the very least every four hours thereafter.  This assessment was not performed, or initiated, by Defendant Avarado.

45.     Instead of flagging Billy as under the influence of alcohol, Defendant Angel Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine.  Due to this intentional inaction, over the next five days, Billy was denied treatment for alcohol withdrawals.

46.     Two days later, on July 29, 2022, mental health personnel from HDDF assessed Billy and determined he was delusional, disorganized, paranoid, and responding to internal stimuli.  The mental health staff at HDDF determined they could not safely house and medically monitor Billy at HDDF as the facility is not equipped to handle SMIL inmates.

47.     On July 30, 2022, Billy was transferred to West Valley for the explicit purpose of housing him as a Severely Mentally Ill Lockdown ("SMIL") inmate because HDDF did not have the medical capacity to house SMIL inmates.  According to the County's policy, SMIL inmates shall be housed in single occupancy cells in "Sheltered Housing."  "Sheltered Housing is located in Unit 15 at West Valley.  Inmates housed in Unit 15 are sheltered due to mental health issues.  Care is provided in Unit 15 on a 24-hour basis, with the support of a medical nurse and mental health personnel."  The setup of Unit 15 allows for constant and continual medical monitoring.

48.     However, despite being transferred to West Valley for continual medical and mental health treatment and monitoring in the SMIL unit, Defendant Zavala, the classification deputy, that knew Billy required Unit 15 housing, intentionally housed Billy in the Covid reception unit, affirmatively denying Billy

12

around the clock medical and mental health monitoring and treatment.  Notably, Defendant Zavala was the only jail personnel that could determine what housing unit and segment Billy could be housed in at West Valley.

49.     In fact, the Covid reception unit, Unit 4, had no medical monitoring requirements in place.  Meaning, Billy was not monitored by medical staff since being transferred to West Valley, and received the same hourly correctional checks that all general population inmates receive.

50.     Billy's symptoms got worse after he was transferred to West Valley.

51.     Knowing that Billy was transferred to another jail, the Enyart Family called West Valley a total of ten times in two days.  Each time, Fran and Greg spoke to DOE jail staff and asked if Billy was ok.  Fran and Greg warned West Valley jail staff that Billy would be suffering from life-threatening alcohol withdrawals and was experiencing a mental health crisis.  The Enyart's were assured Billy was "fine" and receiving appropriate treatment at West Valley. Again, this information was never passed on to medical staff or flagged in Billy's Electronic Health Record.

52.     On July 31, 2022, Billy started showing even more severe signs of medical distress.  Billy was suffering from auditory and visual hallucinations, the most common symptom of delirium tremens.  Billy also had bruises and red welts all over his body, another sign of delirium tremens.  (Notably, all correctional deputies receive on-board training regarding the signs and symptoms of delirium tremens, and its fatality rate if untreated.)  Billy can be seen shaking and banging against the walls.  On several occasions he can be heard asking the deputies, "come help me."  Billy can be heard banging on the cell door, breathing heavily, and asking for help over an extended period of time.  He stated that he was not feeling good.  Instead of responding to Billy or summoning medical aid, the deputies responsible for Billy's housing segment on July 31, 2022, Defendants Natasha

/ / /

COMPLAINT                                    CASE NO.

Charles, Sebastian Herrerra, and Andreas Suarez, intentionally ignored Billy's severe medical distress.

53.    Outrageously, instead of responding to Billy or summoning medical care, Defendants Natasha Charles, Sebastian Herrerra, and Andreas Suarez yelled at Billy to stop banging on the door and to be quiet.  Medical records and discovery responses confirm that Defendants Natasha Charles, Sebastian Herrerra, and Andreas Suarez did not encounter Billy and did not ask for medical intervention.

54.    According to *several* inmate interviews of other inmates housed in Covid reception Unit 4, Billy was continuously screaming and calling out for help on July 31, 2022, and into the morning of August 1, 2022.  Inmates recall hearing Billy yell "help, help" for hours on end.

55.    On the morning of August 1, 2022, the audio interviews and video surveillance confirm that Billy was in continual distress.  At times he is naked in his cell and responding to internal stimuli, i.e., auditory and visual hallucinations.  On several occasions, Billy is seen rocking back and forth, banging on the cell door, and screaming for help.  Video surveillance shows that not one deputy responded to Billy's calls for help.  Similarly, medical records confirm that medical was not summoned by the Unit 4B deputies for intervention.

56.    Defendant Deputy Forrest Pitts, Defendant Deputy Hensman, and Defendant Deputy Alexander Garcia were the deputies responsible for Unit 4B on the morning of August 1, 2022.  Throughout the morning, Defendants heard Billy in distress but failed to act reasonably.  Defendants did not respond to Billy, nor did they summon medical care.  Instead, during their audio interviews with the homicide detective, Defendant Deputy Forrest Pitts and Defendant Deputy Alexander Garcia (Defendant Hensman was not interviewed) acknowledged that Billy was in distress but unreasonably excused his signs of severe medical distress as "typical MIL behavior."  In other words, Defendant Deputy Forrest Pitts, Defendant Deputy Hensman, and Defendant Deputy Alexander Garcia, just thought

14

Billy was "crazy" and ignored his obvious signs of medical distress, and his cries for help.  Furthermore, surveillance video shows that Defendant Deputies, during their morning hourly checks, did not look into Billy's cell during the checks.  In fact, it appears Defendants did not even break stride when performing cell checks of Billy.  This leads Plaintiffs to believe that Billy was yelling in distress and crying out for help most of the morning, as indicated by the other inmates interviewed following Billy's death.

57.     According to Defendant Garcia, who was conducting hourly checks during the morning and lunch hour, Billy was observed doing "typical SMIL things," such as pacing, rocking back and forth, and making certain unusual noises.  Based on the inmate interviews, we now know that some of those "unusual noises" were cries for help.

58.     After reviewing the surveillance video, Plaintiffs discovered that Billy's last movements in his cell occurred at 12:22 p.m.  One minute later, Defendant Garcia enters Unit 4B to conduct the hourly cell checks and to open the food flaps for the lunch trays.  Defendant Garcia walked up to Billy's cell, located on the bottom floor, and asked him if he wanted lunch.  Billy did not respond.  Defendant Garcia is seen looking into Billy's cell, but Billy did not move and was not responsive.  Defendant Garcia continued with his checks of the other cells on the bottom floor.  Before performing checks on the top tier, Defendant Garcia doubled back to Billy's cell.  Billy was in the same position and again was not responding to Defendant Garcia's questions.  Billy was not moving.  Defendant Garcia turned away to walk upstairs.  Defendant Garcia took approximately three steps, at which time Billy fell off the bunk/desk and landed on the floor in the fetal position next to the toilet.  Plaintiffs allege on information and belief that Defendant Garcia, heard, or should have heard, the thud of Billy's body hitting the floor.  Nevertheless, Defendant Garcia went upstairs to perform the cell checks on the top tier.  Approximately 30 seconds later, when Defendant Garcia finished the top tier

15

COMPLAINT                          CASE NO.

checks, he went back to Billy's cell.  Defendant Garcia saw that Billy was lying on the floor unresponsive.  Billy was not moving and was not responsive to Defendant Garcia's commands.  At that point in time, Billy was dead or dying.  Contrary to what a reasonable deputy would have done in this situation, Defendant Garcia walked away from Billy's cell and exited Unit 4B.

59.     Approximately forty minutes later, Defendant Garcia enters Unit 4B again.  He walked straight to Billy's cell and again called out.  Billy was in the exact position that Defendant Garcia last saw him.  Defendant Garcia opened the cell door and tapped Billy on the shoulder.  Billy did not respond or wake up.  Instead of calling a code blue over the radio and/or administering CPR, Deputy Garcia again *walks away* from Billy.

60.     First, Defendant Garcia walked out of Unit 4B and went upstairs to the control bubble.  He told the bubble deputy, "Hey, I think he's dead."  Defendant Garcia then walked to another segment to get his partner, Defendant Pitts.  Defendant Garcia told Defendant Pitts, "I think that guy is dead."  Minutes later, Defendant Pitts and Defendant Garcia walk back into Unit 4B.  Defendant Pitts noticed that Billy was unresponsive and called a code blue over the radio.  Neither Defendant performed CPR.  Once medical personnel arrived, they immediately began to administer life saving measures.  Unfortunately, it was too late.  Upon the arrival of paramedics, Billy was pronounced dead.

61.     Phone records confirm that Fran and Greg called West Valley at least four times on August 1, 2022.  At the times they had called, Billy had already been found dead in his cell.  However, each time Fran and Greg called that day, they were told the same thing they had been told every other time they called the jail, Billy was "fine" and receiving proper treatment.  At 11:45 p.m. that night, two detectives showed up at the Enyart Family house and told Fran and Greg that Billy died in custody earlier that day at 1:15 p.m.  Fran and Greg were distraught and devastated.

16

COMPLAINT                                    CASE NO.

62.     Notably, Defendants Zavala, Charles, Herrera, Suarez, Pitts, Hensman, and Garcia, were individually put on notice that Billy needed constant medical monitoring as a SMIL inmate because he was dressed in red pants and a yellow shirt, which is required clothing for SMIL inmates so that all jail personnel are on notice of the level of care and attention required.  Aside from the uniform, Billy's medical distress was witnessed.

63.     A.E. will never get to share another adventure with her dad, or have his help on her homework, or walk her down the aisle.  She is currently in counseling and misses her dad daily.  Fran and Greg will never be the same.  Their youngest child was taken from them despite moving heaven and earth to get Billy help.  Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer.  Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor.  Since Billy's death, a hole has replaced their heart and Greg's health has rapidly deteriorated.

**V.**

**<u>FIRST CAUSE OF ACTION</u>**

**42 U.S.C. Section 1983 – Inadequate Medical Care**

**(By Successor in Interest Against Deputy Zavala, CSC Charles, Deputy Herrera, Deputy Suarez, Deputy Hensman, Deputy Pitts, and Deputy Garcia, and DOES 1-10)**

64.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

65.     The elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are:

a.     The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

17

b.  Those conditions put the plaintiff at substantial risk of suffering serious harm;

c.  The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and

d.  By not taking such measures, the defendant caused the plaintiff's injuries. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1072 (2016).

66.  The National Commission on Correctional Health Care requires that every jail implement an alcohol withdrawal policy and train staff regarding the signs and symptoms associated with alcohol withdrawals.  Based on information a belief, and the Remedial Plan governing San Bernardino County jails, every Defendant was (or should have been) trained that Delirium Tremens (DT's) is a **<u>medical emergency</u>** and occurs because of severe alcohol withdrawal.  Symptoms include disorientation, memory disturbance, tactile and/or visual hallucinations, delusions including paranoia, increased pulse, blood pressure, temperature, sweating, tremors, and red/itchy skin.  Every Defendant should also be trained that untreated DT's will likely result in death.

67.  If Billy had been offered the proper alcohol withdraw treatment, he would have been prescribed a medication regimen including Librium, Thiamine, and Zofran.  He also should have been housed in an area that could provide 24-hour medical monitoring and at least twice daily vital checks.  The moment Billy displayed severed signs of DTs, Billy would have immediately been rushed to the Emergency Room.  However, this is not what happened.

68.  Instead of flagging Billy as under the influence of alcohol due to Billy's obvious and objective signs of alcohol intoxication, Defendant Angel

18

COMPLAINT                                    CASE NO.

Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine.

69.    This failure was the moving force in ensuring that Billy would not receive the treatment he needed for his impending withdrawals. This failure also ensured that no follow-on medical provider would know that Billy was intoxicated upon booking, and that the severe signs of DTs that developed in the following days were caused by untreated alcohol withdrawals instead of some uncertain mental health condition.

70.    Separate and apart from Defendant Angel Avarado's failure to document or treat Billy for being under the influence and/or for impending withdrawals, Defendant Angel Avarado also failed to treat Billy for hypertension. Billy admitted during the intake evaluation that he suffered from high-blood pressure and that he took atenolol regularly.  Despite documenting this in Billy's medical record, Defendant Angel Avarado failed to treat Billy for hypertension, or order a medical evaluation for medication and management.  It is believed this co-morbidity factor played a role in Billy's preventable death.

71.    Once Billy was transferred to West Valley, Defendant Zavala was duty bound to house Billy in Unit 15, for constant medical monitoring, knowing that he was being transferred as an SMIL inmate.  Defendant Zavala knew all SMIL inmates must be housed in Unit 15 because it provides adequate medical and mental healthcare for those inmates in need.  However, instead of following medical orders, he intentionally housed Billy in a general population Covid unit, in a cell by himself knowing that Unit 4B did not offer any routine medical monitoring. Defendant Zavala failed to inform medical staff that Billy would need routine medical monitoring while housed in Covid reception unit, 4B.  Defendant Zavala also failed to provide any reasonable accommodation to Billy.

/ / /

19

COMPLAINT                              CASE NO.

72.     On July 31 and August 1, 2022, Billy's symptoms worsened.  But for unexplained reasons, Billy received less medical attention at West Valley than he did at HDDF.  Despite outward displays of severe medical distress, and the 10+ calls to West Valley from Billy's family, Billy was never medically monitored for alcohol withdrawals, nor was he administered any medication.

73.     As detailed above, despite constant outward displays of severe medical distress, and continual cries for help, Defendants Charles, Herrera, Suarez, Hensman, Pitts, and Garcia, intentionally ignored Billy's obvious signs of medical distress because he was a typical "mentally ill" inmate.

74.     Defendant Garcia was the last deputy that could have saved Billy's life.  He was present when Billy stopped moving, and when Billy lost consciousness and fell to the ground.  He should have ensured that Billy was alive and not in medical distress, instead he saw Billy was unresponsive but walked away.  When Defendant Garcia returned approximately forty minutes later, he went into Billy's cell and confirmed he was unconscious and unresponsive.  Instead of immediately calling for medical attention or performing CPR, Defendant Garcia *walked* out of Unit 4B and went upstairs to the tower bubble.  After telling another deputy, "I think that guy might be dead," he went back downstairs to another segment to tell Defendant Pitts that he thought Billy was dead.  They both walked back to Unit 4B.  Upon arriving in Billy's cell and confirming Billy's unresponsiveness, Defendant Pitts called for medical attention over the radio but did not start performing CPR.

75.     Each Defendant, individually, lacked care and empathy.  They breached their responsibly to relay critical medical intervention and to summon medical care.

/ / /

/ / /

/ / /

20

COMPLAINT                              CASE NO.

76.     As such, based on the county's training protocol, each Defendant was aware (or should have been) that severe alcohol withdrawals are highly dangerous and can lead to death if not properly treated.  Accordingly, each Defendant knew that failing to summon medical care would likely lead to Billy's death.

77.     Furthermore, based on the county's training protocol, each Defendant was aware (or should have been) that material medical information relating to an arrestee or inmate must be timely conveyed to jail medical staff.

78.     In sum, all Defendants and DOES at HDDF and West Valley knew that the Enyart Family was trying to give information pertinent to proper medical care of Billy, and yet, no one did the due diligence of telling medical personnel about Billy's impending medical distress.

79.     Equally, when Defendants acknowledged Billy's severe medical distress, each ignored him thinking he was just "crazy."  The deliberate indifference and lack of empathy showed by Defendant Zavala and the Unit 4B deputy Defendants is displayed even in their individual failure to ensure that Billy had a mattress in his cell, or that he was given a shower or tier time during his two and a half days at West Valley.  Any reasonable deputy in that situation would have responded to Billy and would have summoned medical care as it was obvious Billy was suffering from acute medical distress for over a day and a half.

80.     Based on the injuries alleged above, and ultimately Billy's foreseeable and preventable death, Billy's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Billy for his injuries and loss of life, and for the violation of his Constitutional and civil rights.

81.     In addition to compensatory, economic, consequential, and special damages, Billy's successor in interest is entitled to punitive damages against individual Defendants under 42 U.S.C. section 1983, in that their actions were done intentionally and with the intent to violate Plaintiffs' right, or was done with a reckless disregard or wanton disregard for Billy's constitutional rights.

COMPLAINT                              CASE NO.

# VI.

## SECOND CAUSE OF ACTION

### 42 U.S.C. Section 1983 – Inadequate Policy and Training

### (By Successor in Interest Against San Bernardino County)

82.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

83.     Defendants San Bernardino County, together with County DOE policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)     Maintaining an inadequate policy and providing inadequate training relating to identification and treatment of inmates under the influence of alcohol and/or suffering from alcohol withdrawals.  Medical and correctional staff are not trained on how to identify the signs of symptoms of (impending) alcohol withdrawals, proper treatment and management, and where such inmates should be housed and/or transported to for elevated care.

(b)     As required by Title 15, the County should have implemented a withdrawal monitoring and treatment program.  The County failed to create a routine need to monitor newly detained people for fatal withdrawals via an automatic screening process.  The most common tool utilized for the monitoring of these symptoms is the Clinical Institute Withdrawal Assessment of Alcohol (CIWA-A or -AR). These tools are only useful if they are administered on a regular basis, every 4-8 hours, when a person enters detention, and until the risk of withdrawal abates.

(c)     Maintaining an inadequate policy and providing inadequate training relating to housing and medical monitoring/treatment for SMIL inmates.  Based on information and belief, the County maintains a

22

COMPLAINT                                          CASE NO.

direct policy of housing SMIL inmates that require Covid quarantine in general reception units. Such units are not designed or designated to have constant medical supervision inside the segment.  The County places SMIL inmates in general reception quarantine units, for 5-7 days, in isolation cells.  This policy or long-standing practice ignores the serious needs of SMIL inmates, and the very purpose for such a designation.  Furthermore, the County failed to implement routine medical checks (and other accommodations) for SMIL inmates housed in covid reception cells despite knowing each SMIL inmate needs constant medical and mental health monitoring; and

(d) Failing to adequately discipline county deputies and medical staff for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct or ratifying their conduct.

84.    Taking no action since 2016, despite signing a Consent Decree which consisted of vast changes, including a "Plan" between the Prison Law Office and the County to fix the broken inadequate medical policies.

85.    The "Plan" which consisted of remedial changes in policy, procedure, and staff changes is "notice" that the County was aware of unsafe conditions in its jails were failing to treat inmates for serious medical conditions because their staff was not properly trained to relay critical medical information to the jail medical staff.  As such, the failure to provide inadequate care is a longstanding custom.

86.    Based on information and belief, Defendant Zavala, Defendant Charles, Defendant Herrera, Defendant Suarez, Defendant Hensman, Defendant Pitts, Defendant Garcia, and DOES 1-10 acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant San Bernardino County.

COMPLAINT                                    CASE NO.

87.     Prior to Billy's foreseeable death, San Bernardino County was put on notice, via other similar cases, that it needed to implement adequate policies, and train its employees.  For example, prior to Billy's death, Betty Lozano, Jacob Hoyo, Albert Snell, Joshua Pitts, David Liebrenz, and Angel Sapien all died in-custody because they were not provided the care they needed despite knowledge by County employees.

88.     In the last three years, over 30 people have died in San Bernardino jails with 18 of these deaths, or 60 percent, being medically related, according to Sherriff's Department figures, which was stated in response to Betty Lozano's jail death.

89.     The failures referenced above, and the failure to implement adequate training, was a moving force in Billy's foreseeable death.

90.     By reason of the aforementioned acts and omissions, Billy died.  His pain and suffering and loss of life is a result of the callous indifference of all Defendants.

91.     All Defendants and DOES 1-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Billy, his family, and other individuals similarly situated.

92.     By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, San Bernardino County acted with intentional, reckless, and callous disregard for the life of Billy and for his and constitutional rights.  Furthermore, the policies, practices, and customs implemented, maintained,

/ / /

COMPLAINT                              CASE NO.

and still tolerated by San Bernardino County and DOES 1-10 were affirmatively linked to and were a significantly influential force behind Billy's death.

93.     Based on the injuries alleged above, and ultimately Billy's foreseeable and preventable death, Billy's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Billy for his injuries and loss of life, and for the violation of his Constitutional and civil rights.

94.     In addition to compensatory, economic, consequential, and special damages, Billy's successor in interest is entitled to punitive damages against individual Defendants under 42 U.S.C. section 1983, in that their actions were done intentionally and with the intent to violate Plaintiffs' right, or was done with a reckless disregard or wanton disregard for Billy's constitutional rights.

## VII.

## THIRD CAUSE OF ACTION

**42 U.S.C. Section 1983 – Due Process – Loss of Familial Association**

**(By Fran Enyart, Greg Enyart, and A.E. Against All Defendants and DOES 1-10)**

95.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

96.     The Ninth Circuit recognizes that a parent and child have a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child.  *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

97.     All Defendants' failures hereinabove described were so egregious and outrageous it would shock the contemporary conscience of any family trying to get help for their loved one that is being detained in jail.  What more could anyone else do?

98.     Defendant Angel Avarado knew Billy was intoxicated and needed a required level of care.  Instead of flagging Billy as under the influence of alcohol

COMPLAINT                                              CASE NO.

due to Billy's obvious and objective signs of alcohol intoxication, Defendant Angel Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine.  This inaction was the moving force in Billy's preventable death.

99.    Defendant Zavala explicitly knew that Billy was transferred to West Valley for a certain level of care marked by the designation, SMIL.  SMIL inmates are housed in Sheltered Housing and are provided continual medical observations. Defendant Zavala knew a doctor had ordered Billy to be housed in SMIL housing based on a medical assessment.  Defendant Zavala made the intentional decision to ignore a medical directive so that he could house Billy in a general population Covid unit instead of SMIL housing.

100.    Due to the intentional misconduct of Defendants Avarado and Zavala, Billy was put into an isolation cell and was forgotten.

101.    On July 30, 2022, video surveillance footage shows Billy shaking and banging up against the walls.  Billy had bruises on his arms, legs, shoulders, and back.  According to the autopsy, his self-injuries were so severe that he broke a rib. Despite these obvious injuries, Unit 4B deputies did not intervene or summon medical care for Billy.

102.    According to *several* inmate interviews of other inmates housed in Covid reception Unit 4, Billy was continuously screaming and calling out for help on July 31, 2022, and into the morning/day of August 1, 2022.  Inmates recall hearing Billy yell "help, help" for hours on end.  Billy can be heard banging on the cell door, breathing heavily, and asking for help over an extended period of time. He stated that he was not feeling good.

103.    Instead of responding to Billy or summoning medical aid, the deputies responsible for Billy's housing segment on July 31, 2022, and August 1, 2022, Defendants Natasha Charles, Sebastian Herrerra, Andreas Suarez, Forrest Pitts,

COMPLAINT                          CASE NO.

Chris Hensman, and Alexander Garcia intentionally ignored Billy's severe medical distress *because* he was an SMIL inmate.  Outrageously, instead of responding to Billy or summoning medical care, Unit 4B Defendants yelled at Billy to stop banging on the door and to be quiet.  Medical records and surveillance footage indicate that not one Defendant intervened or summoned medical care.

104.   On the morning of August 1, 2022, the audio interviews and video surveillance confirm that Billy was in continual distress.  At times he is naked in his cell and responding to internal stimuli, i.e., auditory and visual hallucinations.  On several occasions, Billy is seen rocking back and forth, banging on the cell door, and screaming for help.  Video surveillance shows that not one deputy responded to Billy's calls for help.  Similarly, medical records confirm that medical was not summoned by the Unit 4B deputies for intervention.

105.   Lastly, one minute after Billy stopped moving, Defendant Garcia performed a cell check and saw that Billy was unresponsive and not moving.  Defendant Garcia continued with his checks of the other cells on the bottom floor.  Before performing checks on the top tier, Defendant Garcia doubled back to Billy's cell.  Billy was in the same position and again was not responding to Defendant Garcia's questions.  Defendant Garcia turned away to walk upstairs.  Defendant Garcia took approximately three steps, at which time Billy fell off the bunk/desk and landed on the floor in the fetal position next to the toilet.  Plaintiffs allege on information and belief that Defendant Garcia heard the thud of Billy's body hitting the floor.  Nevertheless, Defendant Garcia went upstairs to perform the cell checks on the top tier.  Approximately 30 seconds later, when Defendant Garcia finished the top tier checks, he went back to Billy's cell.  Defendant Garcia saw that Billy was lying on the floor unresponsive.  Billy was not moving and was not responsive to Defendant Garcia's commands.  At that point in time, Billy was dead or dying.  Contrary to what a reasonable deputy would have done in this situation, Defendant Garcia walked away from Billy's cell and exited Unit 4B.  Defendant Garcia

COMPLAINT                          CASE NO.

returned approximately forty-to-fifty minutes later to find Billy's still and blue in the face.

106.   As a result of Defendants' misconduct, Fran, Greg, and A.E., were deprived of their constitutional right to familial association, society, and companionship, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

107.   These facts equate to conduct that shocks the conscience.  As such all Defendants and DOES 1-10 are liable for the damages associated with Plaintiffs' loss of relationship.  A.E. will never get to share another adventure with her dad, or have his help on her homework, or walk her down the aisle.  She is currently in counseling and misses her dad daily.  Fran and Greg will never be the same.  Their youngest child was taken from them despite moving heaven and earth to get Billy help.  Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer.  Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor.  Since Billy's death, a hole has replaced their heart.

108.   Billy's family seeks damages relating to their loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support.  Plaintiff also seeks reasonable costs, funeral and burial expenses, and attorney's fees under 42 U.S.C. section 1988.

## VIII.

## <u>FOURTH CAUSE OF ACTION</u>

### BANE ACT (Civ. Code, §52.1)

### (By Successor in Interest Against All Defendants and DOES 1-10)

109.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

110.   The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment …

28

of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (§ 52.1, subd. (a); see id., subd. (b).) "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal.App.4th 860, 883 (2007).

111.   "Where the Bane Act violation is based on allegations of an unlawful arrest where there was also excessive force in effectuating that arrest, a Bane Act claim can be stated. See, e.g., *Stubblefield v. City of Novato*, 2016 U.S. Dist. LEXIS 5662, 2016 WL 192539, at *11 (N.D. Cal. Jan. 15, 2016) (discussing cases).

112.   In the Ninth Circuit, as it relates to Bane Act claims relating to inadequate medical care in a correctional setting, controlling law states, with regard to coercive conduct, "at the pleading stage, the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct." *M.H. v. County of Alameda* (N.D. Cal. 2013) 90 F. Supp. 3d 889, 898 Courts have equated the "[t]hreat, intimidation, or **coercion**" requirement to "intentional . . . conduct." *Id.* at 898. "That intent requirement is satisfied where the defendant allegedly acted with '[r]eckless disregard of the right at issue.'" *Cornell v. City and County of San Fransisco* (1st Dist. 2017) 17 Cal. App. 5th at 804.

113.   Defendant Angel Avarado knew Billy was intoxicated and needed a required level of care. Instead of flagging Billy as under the influence of alcohol due to Billy's obvious and objective signs of alcohol intoxication, Defendant Angel Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine. This inaction was the moving force in Billy's preventable death.

/ / /

114.   Once Billy was transferred to West Valley, because he was too unstable to be detained at HDDC, Defendant Zavala was duty bound to house Billy in Unit 15, for constant medical monitoring.  However, instead of following medical orders, he intentionally housed Billy in a general population Covid unit, 4B, in a cell by himself knowing that Unit 4B did not offer any routine medical monitoring.  Defendant Zavala failed to inform medical staff that Billy would need routine medical monitoring while housed in Covid reception unit, 4B.  This decision set a trajectory that would result in Billy's death.

115.   Towards the end of his detention, despite constant outward displays of severe medical distress, and continual cries for help, Defendants Charles, Herrera, Suarez, Hensman, Pitts, and Garcia, intentionally ignored Billy's obvious signs of medical distress *because* he was a typical "mentally ill" inmate.

116.   Defendant Garcia was the last deputy that could have saved Billy's life.  He was present when Billy stopped moving, and when Billy lost consciousness and fell to the ground.  He should have ensured that Billy was alive and not in medical distress, instead he saw Billy was unresponsive but walked away.  When Defendant Garcia returned approximately fifty minutes later, he went into Billy's cell and confirmed he was unconscious and unresponsive.  Instead of immediately calling for medical attention or performing CPR, Defendant Garcia *walked* out of Unit 4B and went upstairs to the tower bubble.  After telling another deputy, "I think that guy might be dead," he went back downstairs to another segment to tell Defendant Pitts that he thought Billy was dead.  They both walked back to Unit 4B.  Upon arriving in Billy's cell and confirming Billy's unresponsiveness, Defendant Pitts called for medical attention over the radio but did not start performing CPR.

117.   Based on Defendants' intentional failure to act as reasonable correctional deputies, as detailed above, San Bernardino County is vicariously liable.  See *Perreault v. Cty. of Westminister* (C.D. Cal. March 7, 2013) 2013 U.S.

30

Dist. LEXIS 31780 at *7 (recognizing availability of *respondeat superior* liability for violations of Bane Act).

118.   Additionally, San Bernardino County is directly liable under the Bane Act because it intentionally chooses not to train or supervise its staff to relay critical information to jail medical staff, as detailed above.

119.   Under the provisions of California Civil Code section 52(b), Defendants are liable for reasonable attorney's fees and a civil penalty of $25,000.

120.   The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for Billy's rights, justifying an award of exemplary and punitive damages against all individual Defendants.

121.   Plaintiff A.E. brings this claim as successors-in-interest to Billy and seeks survival damages including emotional distress and loss of enjoyment of life under this claim.  Plaintiff A.E. also seeks treble damages, attorney's fees, and costs pursuant to Civil Code, section 52.1, as detailed above.

## IX.

## FIFTH CAUSE OF ACTION

### Negligence – Failure to Summon Care (CCP 377.30)

### (By Successor in Interest Against All Defendants and DOES)

122.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

123.   California Government Code section 845.6 creates an affirmative duty for jailers to furnish or obtain medical care for a prisoner in their custody when the jailer knows the inmate is in serious medical distress.

124.   Based on the allegations above, all Defendants knew Billy was suffering from severe medical and mental health distress, yet everyone failed to summon immediate medical care.

125.   Defendant Angel Avarado knew Billy was intoxicated and needed a required level of care.  Instead of flagging Billy as under the influence of alcohol

31

due to Billy's obvious and objective signs of alcohol intoxication, Defendant Angel Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine.  This inaction was the moving force in Billy's preventable death.

126.   Once Billy was transferred to West Valley, because he was too unstable to be detained at HDDC, Defendant Zavala was duty bound to house Billy in Unit 15, for constant medical monitoring.  However, instead of following medical orders, he intentionally housed Billy in a general population Covid unit, 4B, in a cell by himself knowing that Unit 4B did not offer any routine medical monitoring.  Defendant Zavala failed to inform medical staff that Billy would need routine medical monitoring while housed in Covid reception unit, 4B.  This decision set a trajectory that would result in Billy's death.

127.   Towards the end of his detention, despite constant outward displays of severe medical distress, and continual cries for help, Defendants Charles, Herrera, Suarez, Hensman, Pitts, and Garcia, intentionally ignored Billy's obvious signs of medical distress because he was a typical "mentally ill" inmate.

128.   Defendant Garcia was the last deputy that could have saved Billy's life.  He was present when Billy stopped moving, and when Billy lost consciousness and fell to the ground.  He should have ensured that Billy was alive and not in medical distress, instead he saw Billy was unresponsive but walked away.  When Defendant Garcia returned approximately fifty minutes later, he went into Billy's cell and confirmed he was unconscious and unresponsive.  Instead of immediately calling for medical attention or performing CPR, Defendant Garcia *walked* out of Unit 4B and went upstairs to the tower bubble.  After telling another deputy, "I think that guy might be dead," he went back downstairs to another segment to tell Defendant Pitts that he thought Billy was dead.  They both walked back to Unit 4B.  Upon arriving in Billy's cell and confirming Billy's

32

COMPLAINT                        CASE NO.

unresponsiveness, Defendant Pitts called for medical attention over the radio but did not start performing CPR.

129.   Based on these failures, San Bernardino County is vicariously liable for its employees' negligent conduct which was performed within the course and scope of their employment.

130.   In doing the acts and/or omissions herein alleged, all Defendants failed to summon immediate medical care and therefore was negligent in their conduct. As a result thereof, Billy, through his successor in interest, is entitled to all applicable damages according to proof.

131.   Pursuant to Code of Civil Procedure section 377.34, Billy is also entitled to recover "damages for pain, suffering, or disfigurement if the action or proceeding was …filed on or after January 1, 2022, and before January 1, 2026." Accordingly, because this action was filed in April of 2022, Billy is entitled to recover for the pain, suffering, and disfigurement related to the days leading up to his death.

132.   As detailed above, Defendants' conduct amounts to oppression, fraud, or malice within the meaning of Civil Code Section 3294 et supra.  Accordingly, punitive damages should be assessed against Defendants for the purpose of punishment and for the sake of example.

**X.**

**<u>SIXTH CAUSE OF ACTION</u>**

**Wrongful Death (CCP 377.60)**

**(By Fran Enyart, Greg Enyart, and A.E. Against All Defendants and DOES 1-10)**

133.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

134.   "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the

33

COMPLAINT                              CASE NO.

decedent's personal representative on their behalf: … (b)(1)… stepchildren, parents, or the legal guardians of the decedent."  Code of Civ. Proc. 377.60.

135.   Defendant Angel Avarado knew Billy was intoxicated and needed a required level of care.  Instead of flagging Billy as under the influence of alcohol due to Billy's obvious and objective signs of alcohol intoxication, Defendant Angel Avarado intentionally moved Billy through the booking process and failed to document, treat, or house Billy pursuant to the County's policy and standard practices in correctional medicine.  This inaction was the moving force in Billy's preventable death.

136.   Once Billy was transferred to West Valley, because he was too unstable to be detained at HDDC, Defendant Zavala was duty bound to house Billy in Unit 15, for constant medical monitoring.  However, instead of following medical orders, he intentionally housed Billy in a general population Covid unit, 4B, in a cell by himself knowing that Unit 4B did not offer any routine medical monitoring.  Defendant Zavala failed to inform medical staff that Billy would need routine medical monitoring while housed in Covid reception unit, 4B.  This decision set a trajectory that would result in Billy's death.

137.   Towards the end of his detention, despite constant outward displays of severe medical distress, and continual cries for help, Defendants Charles, Herrera, Suarez, Hensman, Pitts, and Garcia, intentionally ignored Billy's obvious signs of medical distress *because* he was a typical "mentally ill" inmate.

138.   Defendant Garcia was the last deputy that could have saved Billy's life.  He was present when Billy stopped moving, and when Billy lost consciousness and fell to the ground.  He should have ensured that Billy was alive and not in medical distress, instead he saw Billy was unresponsive but walked away.  When Defendant Garcia returned approximately fifty minutes later, he went into Billy's cell and confirmed he was unconscious and unresponsive.  Instead of immediately calling for medical attention or performing CPR, Defendant Garcia

34

*walked* out of Unit 4B and went upstairs to the tower bubble.  After telling another deputy, "I think that guy might be dead," he went back downstairs to another segment to tell Defendant Pitts that he thought Billy was dead.  They both walked back to Unit 4B.  Upon arriving in Billy's cell and confirming Billy's unresponsiveness, Defendant Pitts called for medical attention over the radio but did not start performing CPR.

139.   All Defendants committed wrongful acts which proximately caused Billy' premature death.  As Defendants' employer, San Bernardino County, is vicariously liable for Defendants' conduct which was performed in the course and scope of the employment.

140.   These gross failures to act directly and proximately resulted in Billy's premature death.

141.   A.E. will never get to share another adventure with her dad, or have his help on her homework, or walk her down the aisle.  She is currently in counseling and misses her dad daily.  Fran and Greg will never be the same.  Their youngest child was taken from them despite moving heaven and earth to get Billy help.  Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer.  Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor.  Since Billy's death, Greg's health has severely declined.

142.   Accordingly, Defendants' wrongful acts caused Plaintiffs severe emotional damages, including the loss of love, support, guidance, society, and companionship.  Defendants are also responsible for Plaintiffs' further economic loss and non-economic damages according to proof at trial.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                          CASE NO.

# XI.

## SEVENTH CAUSE OF ACTION

### Ratification (42 U.S.C. § 1983)

### (By Successor in Interest Against San Bernardino County and

### Policymaker DOES 6-10)

143.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

144.   "When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.  If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  The Ninth Circuit states that ratification liability may attach when a final policymaker ratifies a subordinate's unconstitutional action and the basis for it. *Christie v. Iopa,* 176 F.3d 1231, 1239 (9th Cir. 1999).

145.   As alleged above, the County has been under immense scrutiny for the outrageous number of severe injuries or deaths within its jails.  Many oversight agencies have audited the County's medical and mental health policies and training programs to assess why the County has continual deaths occurring in its jails.  One of those efforts has resulted in the implementation of the Consent Decree and Remedial Plan, as described above.

146.   Title 15 sets forth the Minimal Standards for Local Detention Facilities.  Title 15 standards governs HDDF and West Valley.  According to Section 1046 of Title 15, "The facility administrator, in cooperation with the health administrator, shall develop written policy and procedures to ensure *that there is an initial review of every in-custody death within 30 days*.  The review team shall include the facility administrator and/or the facility manager, the health

36

administrator, the responsible physician and other health care and supervision staff who are relevant to the incident.  Deaths shall be reviewed to determine the appropriateness of clinical care; whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study."

147.   According to the County's policy, 14.200, Inmate Death Investigations, the In-Custody Death Review Board committee shall meet to discuss every in-custody death.  "The ICD Review Board should thoroughly evaluate, in a fact-finding manner, the following:

a.   The facts contained in the Homicide Detail's criminal investigation report and ICD Summary Memorandum;

b.   Any policy issues or concerns identified as a result of the ICD investigative process;

c.   Any training considerations or concerns identified by the Facility Commander/designee and/or ASU commander;

d.   Any medical related issues or concerns identified by the HAS; and

e.   Any possible liability issues identified by the Civil Liabilities commander and/or County Counsel."

148.   The purpose of the ICD Review Board report is to review the facts of the in-custody death to determine if any employee acted in a way that indicates a need for remedial action.

149.   Despite being mandated by Title 15, and by its own policy, the County and its DOE policymakers, acting under the color of state law in their capacities as Review Board committee members, intentionally refused to conduct an ICD Review Board investigation into Billy's death.  The decision not to perform a Review Board investigation into Billy's death was a conscious and affirmative choice to ratify its employees' misconduct that caused Mr. Enyart's death and to cover up their misconduct from public ridicule.

/ / /

COMPLAINT                              CASE NO.

150.   Based on information and belief, prior to Billy's death, the County intentionally failed to conduct Review Board meeting on cases that contain obvious or significant employee misconduct because the County does not want discoverable evidence, in the form of Review Board memorandums and reports, concluding that County employee misconduct, or the County's inadequate policy or training, caused an inmate's death.

151.   Based on information and belief, County officials and DOE Policymakers are notified immediately when a death occurs inside the jails. Information regarding the inmate and circumstances leading to the inmate's death are immediately disseminated to County officials and DOE Policymakers.  In cases where employee misconduct is obvious or significant, like in Billy's case, the County and DOE Policymakers intentionally decide not to conduct a Review Board investigation so that future litigants are denied the opportunity to discover documents relating to the investigation and the Board's findings of wrongdoing and/or policy and training failures.  This intentional decision not only affirmatively ratifies employee misconduct, and violates Title 15, and the County's own oversight policy, it also ensures that any remedial actions that should be implemented to avoid another preventable death will never occur.

152.   This intentional decision by County officials and DOE policymakers deprived Billy of his particular rights under the Fourteenth Amendment.

153.   County officials and DOE Policymakers had final policymaking authority from the County concerning the Review Board, and its failure to investigate.

154.   By way of their intentional decision to cover up and ratify Defendants Zavala, Charles, Herrera, Suarez, Pitts, Hensman, and Garcia's deliberate indifference, County Officials and DOE Policymakers knew of and specifically made a deliberate choice to approve Defendants Zavala, Charles, Herrera, Suarez, Pitts, Hensman, and Garcia's failure to act and the basis for it.

COMPLAINT                                    CASE NO.

155.   County Officials and DOE Policymakers, failed to act to prevent jail employees from engaging in the alleged misconduct, and in doing so County Officials and DOE Policymakers disregarded the known or obvious consequence that such alleged conduct would cause jail employees to violate the constitutional rights of inmates such as Billy.  Moreover, had County Officials and DOE Policymakers investigated these deaths, implemented remedial measures, and created a culture of accountability, their omission would not be the reason that jail employees violate the constitutional rights of inmates such as Billy.

156.   County Officials and DOE Policymakers' failure to discipline their employees when they denied or delayed medical care to inmates known to be in distress, was so closely related to Billy's preventable suicide as to be the moving force that caused his death.

157.   Due to his preventable and foreseeable death, Billy's Estate is entitled to loss of life damages, pain, and suffering, as well as money damages pursuant to 42 U.S.C. section 1983 to compensate him for his death pursuant to multiple violations of his constitutional and civil rights.

158.   In addition to compensatory, economic, consequential, and special damages, Plaintiffs are entitled to punitive damages against each individual Defendant under 42 U.S.C. section 1983, in that the actions of each were done intentionally and with the intent to violate Billy's right, and/or was done with a reckless disregard or wanton disregard for his life.

## XII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount according to proof;

/ / /

/ / /

COMPLAINT                              CASE NO.

2.      For punitive and exemplary damages against each individually named Defendant in their individual capacity in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3.      For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988, the Bane Act, and as otherwise authorized by statute or law; and

4.      For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## <u>REQUEST FOR JURY</u>

Plaintiffs hereby request a jury trial in this action.


Respectfully submitted,

**PHG Law Group**


Dated:  March 11, 2024          by:  */s/ Danielle R. Pena*
                                        Danielle R. Pena, Esq.
                                        dpena@PHGLawGroup.com
                                        Attorneys for Plaintiffs

COMPLAINT                          CASE NO.